UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
KATHLEEN BUNNELL and
DENNIS BUNNELL,

          Plaintiffs,

-against-                     **MEMORANDUM AND ORDER**
                                   12-CV-6412 (FB) (SMG)

FARZAD HAGHIGHI,

          Defendant.
----------------------------------------------------x

*Appearances:*
*For the Plaintiff:*                         *For the Defendant:*
DEAN T. CHO, ESQ.                DANIEL ALLIANCE, ESQ.
233 Broadway, Suite 2200        159-13 Hillside Avenue
New York, NY 10279               Jamaica, NY 11432

**BLOCK, Senior District Judge:**

      Plaintiffs Kathleen and Dennis Bunnell ("the Bunnells") bring this diversity action against Farzad Haghighi ("Haghighi") for breach of a contract to purchase real property in Queens, New York. The Bunnells allege that they are entitled to retain Haghighi's $125,000 down payment – which is currently being held by the Bunnells' lawyer in an interest-bearing escrow account – because he violated the contract's mortgage contingency clause by failing to make a good-faith attempt to secure a mortgage loan. Haghighi counterclaims that he complied with the terms of the mortgage contingency clause and is therefore entitled to the return of his money.

The Court held a bench trial on February 3, February 17, April 3, May 11, and June 1, 2015. Based on the following findings of fact and conclusions of law, set forth in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court concludes that Haghighi applied for a mortgage loan in good faith and that his $125,000 down payment should be returned to him forthwith.

## I.

At the trial, the Court accepted into evidence copies of the relevant contracts, mortgage loan applications, and letters, and heard testimony from witnesses. The Court will first recount the documentary evidence, which is undisputed, before detailing the testimonial evidence, which is not.

**A.     Documentary Evidence**

On July 27, 2012, Haghighi entered into a contract to purchase the Bunnells' house ("Bunnells' Home") in Forest Hills, New York, for $1.25 million. Per the terms of the contract, Haghighi tendered a $125,000 deposit upon signing as a 10% down payment on the property. The contract contained a mortgage contingency clause providing that:

> This sale is conditioned upon Purchasers obtaining a conventional mortgage in the amount of $750,000 . . . . Purchasers hereby agree to immediately make diligent, truthful and proper application for said mortgage and to furnish all information and records that may be required for said application to the lending institution to whom application is made. . . . If, without fault on their part, Purchasers are unable to obtain

> a mortgage commitment as provided for herein by the aforementioned date, either party may elect to cancel this contract by written notice being give, the deposit paid hereunder shall be returned to Purchasers and thereupon the contract shall cease and terminate . . . .

Pls.' Ex. 1 at 12.

On August 12, 2012, Haghighi entered into a contract to purchase another property (the "Alternate Property") in Forest Hills for $805,000. On the same day, he tendered an $80,500 deposit as a 10% down payment on the Alternate Property.

On August 20, 2012, Landmark Funding Group ("Landmark"), a mortgage brokerage firm based in Brooklyn, completed two Uniform Residential Loan Applications on Haghighi's behalf. In the first application, Haghighi sought a $750,000 loan to purchase the Bunnells' Home. In the second application, Haghighi requested a $400,000 loan to purchase the Alternate Property. Both applications were supported by tax returns, asset statements, and credit reports, which collectively demonstrated that Haghighi owned approximately $800,000 in liquid assets and had a credit score in the high 700s. Except for the property names and loan amounts, the applications were identical.

Landmark submitted the $750,000 loan application to Flagstar Bank ("Flagstar"), which denied the application on August 27, 2012. Flagstar explained that it denied the application for four reasons, namely that Haghighi "has not owned a primary residence for the last 3 years," that he had an "[i]nsufficient credit file," that

Flagstar had received "[i]nformation from [a] consumer reporting agency," and that "[w]e do not grant credit to any applicant on the terms and conditions you requested." Pls. Ex. 14 at 1. On August 28, 2012, Haghighi informed the Bunnells that his loan application had been denied and requested that they cancel the contract and refund his down payment.

At approximately the same time, Landmark submitted the $400,000 loan application to an unknown bank, which approved the application. On September 14, 2012, Haghighi completed the purchase of the Alternate Property.

**B.    Trial Testimony**

The Court heard testimony from three witnesses: (1) Haghighi; (2) Douglas Baum ("Baum"), a Citi home lending officer called by the Bunnells as an expert witness; and (3) Leah Paskus ("Paskus"), the mortgage broker at Landmark who prepared and submitted Haghighi's loan applications. The Court will first recount the testimonial evidence before making factual findings based on the Court's assessment of the witnesses' credibility and persuasiveness.

    1.    <u>Haghighi's testimony</u>

Haghighi testified that he began looking for a house in early 2012 when he was working as a doctor in a residency program. *See* Feb. 3 Tr. at 27:16-19. At the time he signed the contract for the Bunnells' Home, his then-lawyer told him that he would qualify for a $750,000 mortgage loan. *See* Feb. 17 Tr. at 8:21-9:4. After signing the

4

contract, however, Haghighi contacted Landmark and spoke to Paskus, who gave him "very dim" prospects for qualifying. Feb. 3 Tr. at 28:22-24. In particular, Haghighi testified that:

> I told [Paskus] that I don't understand why I wouldn't qualify for a $750,000 mortgage. I'm a doctor, I'm making a six-figure income, and I have a good credit score. She said, doctor, . . . you have a good credit score but you don't have an effective credit history. You never owned any property, you never leased a car. You were making minimum wage in residency. You don't have three years of consecutive income taxes to show [a] six-figure income. And you are essentially on a 1099.

*Id.* at 29:12-21. Haghighi stated that, despite her negative assessment of his application's viability, Paskus was not absolutely sure whether or not he would be denied and told him that, while unlikely, he may ultimately be approved for the mortgage. *See id.* at 37:11-12.

Realizing that his loan application would probably be denied, Haghighi "decided to go with the [Alternate Property] after shopping around extensively and getting verbal denials." *Id.* at 32:23-25. Haghighi thereafter "submitted both [mortgage loan] applications on the same day because I understood the stipulations and terms of the contract I had to fulfill. . . . So I did fulfill my requirements to apply for a mortgage." *Id.* at 33:6-12. Haghighi testified that, if he was approved for both mortgages, he would have borrowed money from his mother and purchased both properties. *See id.* at 68:16-20. Haghighi further testified that he still regrets being unable to purchase the Bunnells' Home, and that "[e]very time I walk by the house I

5

wish I could have bought it." *Id.* at 35:16-20. Finally, Haghighi stated, and the Bunnells did not dispute, that the Bunnells' Home was ultimately sold to a third party for the initial asking price of $1.25 million. *See id.* at 82:14-19.

    2.    <u>Baum's testimony</u>

Baum testified that he was "intimately familiar with [Flagstar's] underwriting" because he had submitted many loan applications to Flagstar in his capacity as President of the New Amsterdam Mortgage Corporation, a position he held from 1993 to 2009. Feb. 17 Tr. at 62:21-25. Based on this experience, Baum opined that Haghighi *should* have qualified for the $750,000 loan because "his credit report was sufficient, assets were sufficient, income was sufficient. Those are the three underwriting buckets." *Id.* at 36:21-23. However, "discrepancies in the application" led Baum to the conclusion that Haghighi "essentially destroyed his ability to procure a mortgage for the [Bunnells' Home]" in order to obtain a declination from Flagstar. *Id.* at 33:24-25, 43:11-13.

First, Baum testified that Flagstar's stated reasons for denying Haghighi's application – in particular that he "has not owned a primary residence for the last 3 years" and that "[w]e do not grant credit to any applicant on the terms and conditions you requested" – were extremely unusual, and strongly implied that Haghighi had intentionally sought out and applied for a mortgage loan he was not qualified to receive. According to Baum, "it is common practice for a mortgage broker . . . to

6

assist their clients [to] obtain contract down payments where [the client] changes his or her mind about purchasing property." *Id.* at 80:7-12.

Second, Baum testified that the application's statement of assets had been completed jointly, which would trigger Flagstar Bank to "pull a joint credit report . . . [and] carry forward the scores for both applicants." Apr. 3 Tr. at 23:20-25. According to Baum, the submission of two credit scores increased the chance of a declination because "[t]he decision is based on the lower of the two [credit scores]." *Id.* at 24:18. On questioning by the Court, Baum conceded that the application and supporting documentation did not list a second applicant's name, but maintained that there is "no question . . . [that] the joint checkmark absolutely pulls two credit reports." *Id.* at 24:6-10.

3. <u>Paskus' testimony</u>

Finally, the Court heard from Paskus, who first explained that the two loan applications she submitted on behalf of Haghighi were subject to two different guidelines. According to Paskus, the $400,000 loan was a Fannie Mae conforming loan, which is subject to less stringent documentation requirements. *See* June 3 Tr. at 7:15-8:22. In contrast, the $750,000 application was a "super jumbo loan," which had "way, way stricter" requirements for approval. *Id.* at 8:19, 9:23. Paskus explained that, for Fannie Mae loans, "[w]e take the application . . . [and] run it through our Fannie Mae automated system [and] get an online approval." *Id.* at 8:7-9.

7

Super jumbo loans, on the other hand, are "manual underwriting loans. That means they dot their i's, cross their t's. . . . [J]umbos are much – you ask any mortgage broker out there – much tougher to obtain. . . . A Fannie Mae loan and a jumbo loan is not apples and oranges, it's Mars and Earth." *Id.* at 8:19-20, 10:6-7, 23:19-20.

Paskus next testified that she received a phone call from Haghighi after he signed the contract for the Bunnells' Home and that "[we] discussed his financing needs." *Id.* at 5:22-23. Based on that conversation, and on her review of his credit score and supporting documentation, Paskus concluded that Haghighi's application for a $750,000 loan was "borderline." *Id.* at 9:18. Paskus spoke to Haghighi again after he had signed the contract for the Alternate Property, at which point Haghighi informed her that he "definitely was going to buy both at the end of day if they were both going to go through. I remember him telling me clearly that." *Id.* at 6:24-7:1.

Paskus subsequently submitted the $750,000 application to Flagstar but "the underwriter went and tore the file apart . . . [a]nd the reason they didn't like it, the credit wasn't thick enough. I think they wanted a history of them owning properties before." *Id.* at 9:10. Paskus testified that she saw nothing unusual about submitting two applications on the same day, stating that "I have people applying for four mortgages at a time. I have no problems. . . . There's a lot of rich people here in New York, believe me." *Id.* at 11:24-12:

The Court then questioned Paskus about the discrepancies noted by Baum.

8

Paskus emphatically denied sabotaging Haghighi's application by applying for a program he was not qualified for, stating that "I don't get paid if loans do not close. I have zero – zero – interest in sending out a loan and getting it denied. I don't look good to banks. I waste my time." *Id.* at 7:2-5. When asked why the statement of assets was completed "jointly," Paskus stated that was a mistake: "[I]f you look at the front page of the application, [at the] manner in which title will be held, it says single man. [The statement of assets] should have changed [by] default in the system. Once you pick single man, it should automatically go to not jointly." *Id.* at 27:14-23. Finally, Paskus disputed that an appraisal was required prior to submitting an application, stating that "we cannot order an appraisal unless the application is approved . . . . As a matter of fact, it's illegal to order the appraisal prior to submission. You have to wait a couple of days in order to order it." *Id.* at 18:10-19.

    4. <u>The Court's factual findings based on the trial testimony</u>

While the Court found Baum to be a generally credible witness, the Court found his testimony – which consisted wholly of speculative inferences drawn from the documentary evidence – to be unpersuasive in light of Haghighi and Paskus' credible testimony based on direct first hand knowledge. In particular, the Court credits Paskus' testimony that she had no incentive to submit an application simply to get denied, and credits Haghighi's testimony that he honestly wanted to purchase the Bunnells' Home. Furthermore, Baum's testimony regarding the "joint" submission

9

of the application is undermined by the Court's independent inspection of the documentary evidence, which revealed that (1) both mortgage applications contained the same "joint" checkmark, and (2) no second applicant's name or personal information was contained in the file submitted by Landmark to Flagstar.

Accordingly, based on the trial testimony, the Court concludes that (1) Haghighi initially entered into contract with the Bunnells under the honest but mistaken belief that he would qualify for a $750,000 mortgage loan; (2) he subsequently learned from Paskus that he would probably not qualify for such a loan; (3) he submitted the application knowing that it would probably be denied, but honestly hoping it would be approved; and (4) if the application was approved, Haghighi would have purchased the Bunnells' Home.

## II.

Under New York law, which governs this diversity action, a mortgage contingency clause in a contract is "construed to create a condition precedent." *Cone v. Daus*, 120 A.D.2d 788, 789, 501 N.Y.S.2d 523 (3rd Dep't 1986). Where, as here, the clause requires the purchaser to make "diligent, truthful and proper application" for a mortgage loan commitment, "[a]s long as the purchasers exert a genuine effort to secure the mortgage financing and act in good faith, they are entitled to rely on the contract and may recover their down payment if the mortgage is not, in fact, approved." *Id.* The burden of establishing that a purchaser failed to act diligently is

with the seller. *See Lindenbaum v. Royco Prop. Corp.*, 165 A.D.2d 254, 260, 567 N.Y.S.2d 218 (1st Dep't 1991) ("[T]o enforce [a] purchase agreement in the absence of the financing contemplated by [a] mortgage contingency clause, it is incumbent upon [the seller] to establish that [the purchaser's] failure to fulfill the condition necessary to obtaining financing was a mere pretense to avoid their obligations under the contract.").

The Court concludes that Haghighi made a genuine effort to comply with the terms of the contract and is therefore entitled to the return of his $125,000 downpayment. First, the Bunnells offered no evidence that Haghighi entered into the contract knowing that he was unable to obtain the loan. *See Blask v. Miller*, 186 A.D.2d 958, 960, 588 N.Y.S.2d 940 (3rd Dep't 1992) (noting that mortgage contingency clause may be breached where purchasers "contract[] to purchase property they may not have been able to afford"). Rather, the evidence adduced at trial revealed that Haghighi honestly but mistakenly relied on the advice of his then-attorney that he would qualify for the loan, and that this reliance was reasonable given Haghighi's high credit score and assets.

Second, the evidence at trial establishes that Haghighi made a diligent and good-faith attempt to secure a mortgage loan commitment. While Haghighi understood that his application would probably not be approved, he nonetheless timely submitted the application and would have purchased the property if the application

was approved, thus satisfying his obligations under the contract. *See Zheng v. Evans*, 63 A.D.3d 791, 791, 881 N.Y.S.2d 461 (2nd Dep't 2009) (affirming summary judgment to purchasers who "demonstrated that, in accordance with the contract of sale, they promptly submitted a mortgage application to an institutional lender, via a mortgage broker, and that their mortgage application was denied"). Furthermore, the Bunnells' sole evidence to the contrary consisted of speculation drawn from the documentary evidence and directly contradicted by credible first hand testimony. *See Cordova v. Vinueza*, 20 A.D.3d 445, 446, 798 N.Y.S.2d 519 (2nd Dep't 2005) (summary judgment in favor of purchasers was warranted where seller's sole evidence that purchasers breached the mortgage contingency clause was speculation unsupported by the evidence).

Accordingly, the Court concludes that Haghighi complied with the terms of the mortgage contingency clause and that he is therefore entitled to the return of his $125,000 down payment. In addition, pursuant to the contract, Haghighi is entitled to all interest accrued in the escrow account from the time of deposit. *See* Pls. Ex. 1 ¶ 6.[1]

---

[1] Generally, under New York law, a prevailing party in a breach of contract action is entitled to prejudgment interest at a rate of nine per cent per annum. *See* N.Y. C.P.L.R. §§ 5001(a), 5004; *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) ("In a diversity case, state law governs the award of prejudgment interest."). However, parties may contract around the statutory prejudgment interest rate. *See J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 117, 980 N.E.2d 940 (2012) ("In breach of contract cases *where parties do not specify the exclusive remedy*, CPLR 5001 (a) requires that statutory interest be paid." (emphasis added)).

**III.**

Finally, the Court notes that the Bunnells sought to introduce evidence at trial that Haghighi's lawyer committed sanctionable conduct during the course of this litigation, which has been protracted and often contentious. While the Court prohibited the introduction of such evidence to focus on the merits of the case, the Court hereby grants the Bunnells leave to file a motion for Rule 11 sanctions in relation to the alleged objectionable conduct. In addition, the Court grants the Bunnells leave to move for attorneys' fees under New York Civil Practice Law and Rules § 6514(c) in regards to the *lis pendens* filed by Haghighi during the pendency of this action. Because the alleged sanctionable conduct in question occurred primarily before Magistrate Judge Gold, the Bunnells shall address the motion to Judge Gold for a Report and Recommendation.

**IV.**

For the foregoing reasons, the Clerk is directed to enter judgment in favor of Haghighi and against the Bunnells in the amount of $125,000, representing Haghighi's down payment on the Bunnells' Home. In addition, Haghighi is entitled to any interest accrued on the down payment and to post-judgment interest pursuant to 28 U.S.C. § 1961. *See FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 147 (2d

---

Since the contract here specifies that interest on the down payment "shall be paid to the party entitled to the Downpayment," Pls. Ex. 1 at ¶ 6, prejudgment interest pursuant to N.Y. C.P.L.R. § 5001 is not warranted in this case.

13

Cir. 2010) ("[T]he federal post-judgment interest rate provided for in 28 U.S.C. § 1961 applies in diversity cases.").

**SO ORDERED.**

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 27, 2015